1   BRENDA W. DAVIS, *pro hac vice*
    bdavis@bwdlawgroup.com
2   THE BRENDA DAVIS LAW GROUP
    1990 3rd Street, Suite 400
3   Sacramento, CA. 95811
    Telephone:   (916) 341-7400
4   Facsimile:   (916) 341-7410
5
    Attorneys for Plaintiffs
6   COUNCIL FOR ENDANGERED SPECIES ACT RELIABILITY,
    and DR. GEORGE YARD
7

8                      **UNITED STATES DISTRICT COURT**

9                          **DISTRICT OF ARIZONA**

10

11
    COUNCIL FOR ENDANGERED SPECIES          Case No.:
12  ACT RELIABILITY, a nonprofit organization;
    and DR. GEORGE YARD
13
                                            **COMPLAINT FOR DECLARATORY AND**
14              Plaintiffs,                 **INJUNCTIVE RELIEF**

15          v.

16  LISA P. JACKSON, as Administrator of the
    United States Environmental Protection
17  Agency; UNITED STATES
    ENVIRONMENTAL PROTECTION
18  AGENCY; and JARED BLUMENFELD, as
    Region 9 Administrator of the United States
19  Environmental Protection Agency,
20
                Defendants.
21

22

23

24

25

26

27

28

Complaint For Declaratory and Injunctive Relief

# I.   **INTRODUCTION**

1.      This is an action for declaratory judgment and injunctive relief which arises under and asserts violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§1531-1544.

2.      Plaintiffs COUNCIL FOR ENDANGERED SPECIES ACT RELIABILITY ("CESAR") and DR. GEORGE YARD challenge the failure of Defendants UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"); LISA P. JACKSON, as Administrator of the EPA; and JARED BLUMENFELD, as Region 9 Administrator of the EPA, to comply with the ESA in re-registering the pesticide rotenone for aquatic use and in approving of its applications to Arizona's rivers, streams, lakes, and stock ponds as a piscicide.   Defendants' failure to comply with the ESA is jeopardizing the continued existence of Chiricahua leopard frogs (*Rana chiricahuensis*)[1], Spikedace (*Meda fulgida*)[2], Loach minnow**s** (*Tiaroga cobitis*)[3], bonytail chubs (*Gila elegans*)[4], and razorback suckers (*Xyrauchen texanus*)[5] (collectively the "affected endangered and threatened species"), all of which are federally listed endangered and threatened species, and adversely modifying certain of these species' critical habitat.

3.      The Defendants' actions violate the ESA by failing to pursue consultation with the FWS regarding the effects of the re-registration of rotenone on the affected endangered and threatened species, in violation of §7(a)(2) of the ESA. 16 U.S.C. §1536(a)(2).

4.      These violations continue despite the availability of considerable scientific research showing that aquatic use of rotenone for piscicidal (fish-killing) purposes can adversely affect the health and survival of the affected endangered and threatened species and the habitat on which they depend.

5.      Plaintiffs seek a judgment declaring that EPA has violated the ESA by re-registering and allowing continued use of rotenone without completing consultations with the FWS and without

---

[1]  Listed as threatened June 13, 2002, 67 Fed. Reg. 40789-40811.
[2]  Listed as threatened July 1, 1986, 51 Fed. Reg. 23769-23781.
[3]  Listed as threatened October 28, 1986, 51 Fed. Reg. 39468-39478.
[4]  Listed as endangered with critical habitat,  November 2, 2005, 70 Fed. Reg. 66663-66721.
[5]  Listed as endangered October 23, 1991, 56 Fed. Reg. 54957-54967; critical habitat designated March 21, 1994, 59 Fed. Reg. 13374-13400.

1   ensuring that the pesticide re-registration will not jeopardize listed species' existence and will not

2   destroy and/or adversely modify their designated critical habitat.  Plaintiffs seek an order (1)

3   compelling EPA to initiate consultations with the FWS regarding the effects of rotenone, and any

4   organic and/or synthetic formulations thereof, on the affected endangered and threatened species that

5   may  be  affected by the aquatic use of this  pesticide; and (2) granting interim protective measures to

6   prevent harm to listed species and their designated critical habitat until the consultation process is

7   complete and the EPA brings the re-registration for rotenone into compliance with the ESA.

8        6.      Plaintiffs also seek an order declaring that the EPA has violated Section 7(d) of the

9   ESA by making irreversible and irretrievable commitments of resources prior to the conclusion of the

10  consultation process.

11                          **II.    JURISDICTION AND VENUE**

12       7.      This action is brought pursuant to section 11(g)(1) of the ESA, 16 U.S.C. §540(g)(1).

13  This Court has jurisdiction pursuant to 16 U.S.C. §1540(g)(1), and 28 U.S.C. §1331. Further, the

14  Court may grant declaratory and injunctive relief.  28 U.S.C. §§2201, 2202.

15       8.      As required by the ESA citizen suit provision, Plaintiffs CESAR and Dr. George Yard

16  provided 60 days' notice of intent to sue on July 26, 2010 to Defendants via express courier and

17  facsimile. A copy of the notice is appended as Exhibit A. To date, Defendants have not remedied the

18  violations set forth in the 60-day notice nor have they provided any response to the July 26, 2010

19  correspondence.

20       9.      Venue is proper in the District Court for the District of Arizona pursuant to 28 U.S.C.

21  §1391(e).   The federal government has waived sovereign immunity in this action.   16 U.S.C.

22  §1540(g); 5 U.S.C. §702.

23                              **III.    PARTIES**

24       10.     Plaintiff CESAR is a California nonprofit, public interest organization whose mission

25  is to bring scientific rigor to regulatory decisions undertaken pursuant to environmental statutes, to

26  ensure consistent application of these statutes throughout all industries and all sectors, and to fulfill

27  the educational goals of its members and provide educational information on the ESA and its

28  application to the general public in the process.   See http://bestscience.org/.   CESAR fulfills its

mission by holding educational seminars, disseminating educational materials to its members, participating in administrative proceedings, and commenting on and initiating litigation about species listings under the ESA.  CESAR brings this action on its own behalf and on behalf of its adversely affected members.

11.     Plaintiff Dr. George Yard owns ranch land, lives on and has cattle on land threatened by the re-registration, approval and subsequent use of rotenone by Defendants and has been and will be adversely affected by Defendants' failure to comply with the ESA.  This is because rotenone has already been applied to the upper Verde River upstream from Dr. Yard's ranch (in 2009), will likely be applied there again in 2010, and because at least two more Arizona streams (West Fork of Oak Creek, upstream of Sedona, Arizona, and Redrock Canyon, upstream of Patagonia, Arizona) are currently proposed for rotenone poisoning in 2010.

12.     Unless the relief requested is granted, Dr. Yard's educational, moral, spiritual, scientific, recreational, biological, property, personal health, and aesthetic interests will continue to be adversely affected and injured by the Defendants' failure to consult with the FWS under the ESA.

13.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"), is an agency of the United States charged with registering and re-registering pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§136-136y ("FIFRA") and with ensuring that the authorized pesticide uses will not cause unreasonable adverse effects on the environment. The EPA is also charged with ensuring that, through consultation with the FWS, its pesticide registrations will not jeopardize the survival and recovery of listed species or destroy or adversely modify their designated critical habitat.

14.     Defendant LISA P. JACKSON is the Administrator of the EPA and is named in her official capacity.

15.     Defendant JARED BLUMENFELD is the Region 9 Administrator of the EPA and is named in his official capacity.

### IV.     LEGAL BACKGROUND

#### A.     ESA Framework

16.     When a species has been listed as threatened or endangered under the ESA, federal agencies have duties under the ESA to assess and bring their programs and activities into compliance with the ESA. These duties fall into two categories: (1) the duty to ensure that agency actions will not jeopardize the survival and recovery of listed species or adversely modify critical habitat for such species; and (2) the duty to utilize agency programs and authorities to conserve listed species. The ESA prescribes the process to be followed to ensure compliance with each set of duties.

17.     Section 7(a)(2) of the ESA requires the following: "each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary … to be critical." 16 U.S.C. §1536(a)(2).

18.     The ESA establishes an interagency consultation process to assist federal agencies in complying with their substantive Section 7(a)(2) duty to guard against jeopardy to listed species or destruction or adverse modification of critical habitat. Under Section 7(a)(2), federal agencies must consult with the appropriate expert fish and wildlife agency to determine whether their actions will jeopardize listed species' survival or adversely modify designated critical habitat, and if so, to identify ways to modify the action to avoid that result. 50 C.F.R. §402.14.

19.     An agency must initiate consultation under Section 7 whenever it undertakes an action that "may affect" a listed species or critical habitat. 50 C.F.R. §402.14(a). Conversely, an agency is relieved of the obligation to consult on its actions only where the action will have "no effect" on listed species or designated critical habitat. Effects determinations are based on the direct, indirect, and cumulative effects of the action when added to the environmental baseline and other interrelated and interdependent actions. 50 C.F.R. §402.02 (definition of "effects of the action").

20.     Regulations implementing Section 7 broadly define the scope of agency actions subject to consultation to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including the promulgation of regulations and the granting of licenses. 50 C.F.R. §402.02 (definition of "action").

21.     Agencies must consult on ongoing agency actions over which the federal agency retains, or is authorized to exercise, discretionary involvement or control. See, e.g., 50 C.F.R. §402.16 (re-initiation of consultation). Agencies must also consult on ongoing agency actions "if a new species is listed . . . that may be affected by the identified action." *Id.*

22.     To initiate consultation, an agency must assess the impacts of the action on listed species and their habitat and provide all relevant information about such impacts to the expert fish and wildlife agency. 50 C.F.R. §402.14(c). The ESA provides for formal consultations, culminating in FWS' issuance of a biological opinion. By regulation, FWS has provided that, if the action agency determines that an action "may affect," but is "not likely to adversely affect" the listed species or its critical habitat, the consultation may be resolved without preparation of a biological opinion if FWS concurs in writing in that determination. 50 C.F.R. §402.13. If FWS does not concur, or if the action agency has determined that the action is "likely to adversely affect" the listed species, the agencies must conduct a formal consultation. *Id.* §§402.02, 402.14(a).

23.     The end product of formal consultation is a biological opinion in which FWS determines whether the action will jeopardize the survival and recovery of listed species or will adversely modify the species' critical habitat. 16 U.S.C. §1536(b). In order to make this determination, FWS must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of federal and nonfederal activities in the area, on the listed species. 16 U.S.C. §1536(b)(3)(A); 50 C.F.R. §402.14(g)-(h). FWS has a statutory duty to use the best available scientific data in an ESA consultation. 16 U.S.C. §1536(a)(2); 50 C.F.R. §402.14(g)(8). If FWS determines that the action is likely to jeopardize the species, the biological opinion must specify reasonable and prudent alternatives that will avoid jeopardy. 16 U.S.C. §1536(b); 50 C.F.R. §402.14(h)(3). FWS must also formulate discretionary conservation recommendations to reduce or minimize the action's impacts on listed species or critical habitat. 50 C.F.R. §402.14(g)(6).

24.     Section 7(d) of the ESA mandates against "irreversible and irretrievable commitment of resources" that would foreclose the agency's ability to implement reasonable and prudent alternatives. 16 U.S.C. §1536(d); 50 C.F.R. §402.09. The purpose of this section is to insure that the

1    existing environmental status quo is maintained during the consultation process so as not to foreclose

2    consideration and adoption of alternatives to the proposed federal agency action. *Connor v. Burford*,

3    848 F.2d 1441, 1445 n. 34 (9th Cir. 1988). This prohibition on irreversible and irretrievable

4    commitment of resources applies throughout consultation and continues until the requirements of

5    section 7 are completed.

6         **B.    FIFRA**

7         25.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") charges the EPA

8    with registering, reviewing, amending, and re-registering chemicals and chemical formulations for

9    use as insecticides, fungicides, and pesticides in the United States. 7 U.S.C. §§136-136y. Under

10   FIFRA, a pesticide generally may not be sold or used in the United States unless it has an EPA

11   registration for that particular use. 7 U.S.C. §136a(a). 27.   After approving a pesticide registration,

12   EPA retains discretionary involvement and control over that registration. EPA must periodically

13   review pesticide registrations with a goal of reviewing each pesticide registration every 15 years. Id.

14   at §136a(g)(1). EPA has the authority to compel registrants to submit data necessary for a re-

15   registration review. Id. at §136a(g)(2). Even apart from such explicit data submission requirements,

16   registrants must submit to EPA any information about registered pesticides' unreasonable adverse

17   effects on the environment. *Id.* at §136d(a)(2). EPA takes such information into account in reviewing

18   and, where necessary, modifying the pesticide registrations.

19        26.    EPA is in a process of re-registering pesticides that have been on the market for years

20   and often decades prior to enactment of the environmental registration requirements currently in

21   place. 7 U.S.C. §136a(1). EPA generally eliminates or imposes restrictions on harmful uses of the

22   pesticides, including those uses that cause harm to threatened or endangered species, as part of the re-

23   registration determination.

24        27.    The EPA Administrator has the authority to cancel pesticide registrations whenever "a

25   pesticide or its labeling or other material required to be submitted does not comply with the

26   provisions of this Act or, when used in accordance with widespread and commonly recognized

27   practice, generally causes unreasonable adverse effects on the environment." 7 U.S.C. §136d(b). The

28

1    Administrator may immediately suspend a pesticide registration to prevent an imminent hazard. *Id.*

2    §36d(c).

3           **C.      Rotenone Use and the Affected Endangered Species**

4           28.     The EPA classifies rotenone as highly toxic or slightly toxic depending on

5    concentration. The World Health Organization classifies it as moderately hazardous. (IPCS,

6    International Programme on Chemical Safety; United Nations Environment Programme; International

7    Labour Organization; World Health Organization. (2007). The WHO Recommended Classification of

8    Pesticides by Hazard.  WHO (www.who.int/ipcs/publications/pesticides_hazard/en/.)  Rotenone is

9    classified by the United States Department of Agriculture National Organic Program as a

10   nonsynthetic and was allowed to be used to grow "organic" produce until 2005 when it was removed

11   from the list of approved substances due to concerns about its safety. (Rotenone. Resource Guide for

12   Organic and Disease Management. Cornell University.)     Potential problems in mammals include

13   dermatitis, allergies and possible Parkinson's like symptoms (Caboni P, Sherer T, Zhang N, Taylor G,

14   Na H, Greenamyre J, Casida J (2004). "Rotenone, deguelin, their metabolites, and the rat model of

15   Parkinson's disease". Chem Res Toxicol 17 (11): 1540–8. doi:10.1021/tx049867r. PMID 15540952.).

16   Additionally, a recent scientific study published in the *Journal of Agromedicine* shows a correlation

17   between 100 Parkinson's disease patients and the use of the pesticide rotenone (Dhillon, AS,

18   Tarbutton, GL, Levin, JL, Plotkin, GM, Lowry, LK, Nalbone, JT and S Shepard (2008).

19   "Pesticide/environmental exposures and Parkinson's disease in East Texas."  J Agromedicine.  2008;

20   13(1): 37-48.).

21          29.     The approved use of rotenone as an aquatic pesticide introduces many toxins into the

22   affected endangered and threatened species' habitat.  Three ingredients in current rotenone

23   formulations are on the Proposition 65 list of chemicals known to the State of California to cause

24   cancer or reproductive toxicity.  Moreover, exposure to rotenone has recently been directly linked

25   with Parkinson's disease in humans. Further, rotenone, when used as an aquatic pesticide, interferes

26   with oxygen use and is especially toxic to organisms that obtain oxygen from water, such as fish,

27   amphibians and aquatic invertebrates.  Certain species of aquatic invertebrates and native fishes are

28

particularly susceptible to long-term or permanent extirpation from streams poisoned by rotenone. (Mangum and Madrigal (1999); Maslin (1996)).

30.     Rotenone also has indirect lethal and sublethal effects as amphibians, birds and other species will likely suffer from depleted food sources because rotenone will substantially decrease insect populations and other macro-invertebrate populations and will eliminate fish populations depended on as food sources.

31.     Despite this readily available information regarding these detrimental effects of rotenone, the EPA neither initiated the requisite ESA consultation nor complied with the FIFRA prior to issuing its re-registration decision on rotenone and approving its use as an aquatic pesticide.

## V.     FIRST CLAIM FOR RELIEF

### (Violations of The Endangered Species Act [16 U.S.C. §1536(a)(2) and (d))

32.     Each and every allegation set forth above in Paragraphs 1 through 30 is hereby re-alleged and is incorporated herein by reference.

33.     Section 7(a)(2) of the ESA states the following: Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce], insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of[critical] habitat . . ..16 U.S.C. §1536(a)(2). "Its very words affirmatively command all federal agencies to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of an endangered species." *TVA v. Hill*, 437 U.S. 153, 173(1978). The EPA and FWS must review their actions through the consultation process at the earliest possible time to determine whether any action may affect listed species or critical habitat. 50 CFR §402.14(a). Re-initiation of consultation is required and must be requested by the EPA or the FWS where discretionary federal involvement or control over the action has been retained or is authorized by law and a new species is listed or critical habitat designated that may be affected by the identified action. 50 CFR §402.16(d).

34.     On its face and under ESA implementing regulations, section 7(a)(2) of the ESA applies to licenses such as EPA's registration and re-registration of pesticides. 50 C.F.R. §402.02.

EPA's findings of risks of concern for threatened and endangered species equates with a "may affect" finding that triggers ESA's consultation mandates.

35.    In the ESA implementing regulations the FWS has further adopted counterpart regulations specifically to address EPA consultations under FIFRA.  50 C.F.R. §§ 402.40, *et. seq*. These regulations, titled Subpart D—Counterpart Regulations Governing Actions by the U. S. Environmental Protection Agency Under the Federal Insecticide, Fungicide and Rodenticide Act, require an "effects determination" by EPA, among other obligations.  The stated purpose of these counterpart regulations is to enhance the efficiency and effectiveness of *the existing consultation process under section 7 of the ESA* by providing the FWS and EPA with additional means to satisfy the requirements of section 7(a)(2) of the ESA for certain regulatory actions under FIFRA.  50 C.F.R. §402.41.

36.    Under the ESA, the EPA has a duty to undergo consultation to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of an endangered or threatened species." 16 U.S.C. §1536(a)(2).

37.    In its ecological risk assessments for rotenone, EPA states that "the ecological assessment that EPA conducted for this Reregistration Eligibility Decision for Rotenone does not, in itself, constitute a determination as to whether specific species or critical habitat may be harmed by the pesticide. Rather, this assessment serves as a screen to determine the need for any species specific assessment that will evaluate whether exposure may be at levels that could cause harm to specific listed species and their critical habitat." This statement is insufficient to meet the EPA's requirements under the ESA.  Over 37 threatened and endangered species live in counties where such uses are authorized to occur.  For example, Chiricahua leopard frogs (*Rana chiricahuensis*), Spikedace (*Meda fulgida*), Loach minnow**s** (*Tiaroga cobitis*), bonytail chubs (*Gila elegans*), and razorback suckers (*Xyrauchen texanus*) live at rotenone application sites and/or sites of proposed application of rotenone and may be severely adversely affected by use of rotenone as an aquatic pesticide.

38.    EPA is in violation of section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), by re-registering rotenone without completing the ESA-mandated consultations and without ensuring that

the re-registered pesticide uses will not jeopardize the survival and recovery of threatened and endangered species and will not destroy and/or adversely modify their critical habitat.

39.     Separately, section 7(d) of the ESA, 16 U.S.C. §1536(d), prohibits federal agencies, after the initiation of consultation under section 7(a)(2), from making any irreversible or irretrievable commitment of resources if doing so would foreclose the implementation of reasonable and prudent alternatives. 16 U.S.C. §1536(d); 50 C.F.R. §402.09.  The status quo must be maintained during the consultation process so as not to foreclose consideration and adoption of alternatives to the proposed federal agency action. *Connor v. Burford*, 848 F.2d at 1445 n. 34. Because the registration program is an "agency action" triggering the consultation process, the EPA is subject to the prohibition on making irreversible and irretrievable commitments of resources pending final resolution of the consultation process.

40.     As EPA continues to allow uses of rotenone prior to completion of an ESA consultation, it makes irreversible and irretrievable commitments of resources that will foreclose the implementation of reasonable and prudent alternatives that may result from the consultation and, therefore, is in violation of section 7(d) of the ESA.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment providing the following relief:

1.     Declare that EPA violated sections 7(a)(2) and 7(d) of the ESA by failing to complete ESA consultations before re-registering rotenone use and for failing to ensure that the re-registered uses will avoid jeopardizing the survival and recovery of threatened and endangered species and destroying and/or adversely modifying their designated critical habitat;

2.     Order EPA to consult with the FWS pursuant to section 7(a)(2) of the ESA on the re-registered uses of rotenone that "may affect" threatened and endangered species and/or their designated critical habitat, and direct EPA to ensure that it conducts the consultations in a manner that addresses the most significant threats posed to listed species by pesticide use in an expeditious fashion;

3.      Order EPA to make a new re-registration eligibility decision for rotenone use on an expeditious basis in which EPA re-registers a use of a pesticide only when the pesticide registrants have proved that the health, environmental, economic, and social benefits outweigh the risks; and ensures, based on completed section 7(a)(2) consultations, that the re-registered pesticide uses will avoid jeopardizing the survival and recovery of threatened and endangered species and destroying and/or adversely modifying their critical habitat;

4.      Order the EPA to prohibit uses of rotenone affecting the endangered and threatened species identified herein, and their critical habitat, until the consultation process has been completed and the EPA has brought its pesticide registration program into compliance with ESA §7(a)(2);

5.      Award Plaintiffs' costs, including reasonable attorneys' fees; and

6.      Provide such other and further relief as the court deems just and proper.

DATED THIS 22nd day of December, 2010.


THE BRENDA DAVIS LAW GROUP


__/s/ Brenda W. Davis_____
Brenda W. Davis


Attorneys for Plaintiffs


**CERTIFICATE OF SERVICE**

        I hereby certify that on December 22, 2010, I served the attached document by First Class Mail on the following, who are not registered participants of the CM/ECF System:


__/s/ Leah Zabel_____
Leah R. Zabel

U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460
///
///

Jared Blumenfeld Regional Administrator
U.S. Environmental Protection Agency
Region 9
75 Hawthorne Street
San Francisco, CA 94105

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1l01A
Washington, D.C. 20460

Mr. Eric Holder, United States Attorney General
Department of Justice
Main Justice Building
950 Pennsylvania Avenue
Washington, D.C. 20530

Civil Process Clerk
U.S. Attorney, District of Arizona
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004-4408